IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

MONTAVIOUS HARDWICK,

Defendant.

CRIMINAL CASE NO.

1:18-CR-398-AT-JFK

## <u>REPORT AND RECOMMENDATION</u>

Pending before the court are Defendant Montavious Hardwick's motion [Doc. 17] to suppress statements and motion [Doc. 18] and amended motion [Doc. 21] to suppress evidence seized pursuant to the execution of a state search warrant and a subsequent federal search warrant.  Defendant contends that (1), with respect to the state search warrant, the executing officers seized electronic items and ammunition not authorized by the warrant; (2), with respect to the federal search warrant, the time frame allowed for seizure of information exceeded the scope of probable cause; and (3) his statements were initially made without <u>Miranda</u> warnings and, after warnings, were involuntary without a valid <u>Miranda</u> waiver.  [Doc. 28].  The Government responds opposing the motion to suppress arguing that (1), with respect to the state search warrant, the items seized fell within the exigency exception or plain view

doctrine; (2), with respect to the federal search warrant, the time frame authorized was supported by probable cause and was reasonable; and (3) Defendant's initial statements were non-custodial and subsequent statements followed a valid waiver of <u>Miranda</u> rights. [Doc. 19].  Plaintiff's reply brief in support of the motions to suppress opposes the Government's arguments.  [Doc. 39].  After consideration of the arguments of the parties and the binding and persuasive legal authority, the court recommends that Defendant's motions to suppress be denied with the single exception of the pre-<u>Miranda</u> statement regarding his criminal history.

## I.      Background

On September 19, 2018, City of Atlanta Police Department ("APD") Investigator ("Inv.") B. Ernest presented an affidavit for a search warrant to a Fulton County Superior Court Judge for the residence located at 1167 Fenwood Street, S.W., Atlanta, Georgia  30314.  (Tr. at 14; Gov't Exh. 2 ("State Warrant")).[1]  The Superior Court Judge, "[b]ased upon the affidavit given under oath or affirmation . . . [was] satisfied that there is probable cause to believe that a crime is being committed or has been committed and that the property described above is presently located on the

---

[1]On January 9, 2019, an evidentiary hearing was held regarding the execution of the state search warrant and the statements Defendant made at the time the search warrant was executed.  Citations to the evidentiary hearing transcript are:  (Tr. at ).

person, premises, or property described above." (State Warrant). The premises "described above" is the residence located on Fenwood Street, and the "property described above" is: "Marijuana, Cocaine, and Ecstasy and any other illegal narcotics, weapons, money/assests [sic] derived from drug sales or which is defined as contraband under Georgia State law, notebooks, binders, or papers depicting pay-owe sheets or evidence of narcotics possession or distribution, packaging and measuring equipment used in the drug trade, and other tangible evidence being held in violation of Georgia state law." (Id.). Inv. Ernest also "request[ed] permission to seize any of the items in the 'items to be seized' section of the search warrant application . . . which is being held in violation of: 16-13-30 of the Georgia Controlled Substance Act." (Id.).

In support of the search warrant, Inv. Ernest first set forth his training and experience as a law enforcement officer, including his assignment to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") as a Task Force Officer ("TFO") since 2013 and his involvement in a number of investigations of drug trafficking organizations and individuals. (Tr. at 14; Gov't Exh. 2 ("State Affidavit")). On May 3, 2018, two ATF special agents debriefed a confidential informant ("CI"), who had previously provided information leading to the seizure of drugs and firearms, regarding drugs, heroin and marijuana, being sold throughout the day at the Southern Grocery

3

("Grocery") located on Westview Drive, S.W., Atlanta.  (State Affidavit).  The CI advised that, in addition to drugs, a firearm might be purchased.  (Id.).

On June 29, 2018, ATF agents and TFOs met with the CI to conduct an undercover purchase of drugs from the Grocery.  The CI and his vehicle were searched for contraband - nothing being found, and he was provided funds for the purchase and equipped with a recording device.  (Id.).  The CI entered the Grocery, purchased two packs of cigaillos and was directed by the cashier to Lindell ("Lin") Jackson who sold the CI a quantity of marijuana for $62.00.  Jackson advised the CI that he was at the Grocery "all day, every day" and provided the CI with telephone number (770) 885-0984.  After the purchase, the CI turned over the evidence and recording equipment to ATF agents.  (Id.).  The substance tested positive for marijuana, and investigation revealed that the telephone number belonged to Lindell Jackson.  (Id.).  On July 13, 2018, the CI - after the same pre-purchase meeting with the agents - made a second controlled purchase from Jackson at the Grocery.  Jackson, who had a pistol tucked in his waistband, asked the CI if he needed a "'throwaway' (street slang for a pistol)" and said, "'I got it' and . . . would charge the CI $250 for it."  (Id.).  Jackson sent another person, Sky, to get a pistol from a nearby apartment building.  Jackson sold a Beretta PX4, 9mm, pistol to the CI for the $250.  (Id.).  Jackson also sold the CI a quantity of

marijuana for $60.00, and he stated that "Boo" was on his way with cocaine.  Jackson left to meet Boo.  (Id.).  Jackson and Boo arrived, and Boo removed a bag of cocaine from his pants pocket and sold the drugs to the CI for $100.  Then Jackson instructed Sky to go get pills, and she left, returned shortly thereafter and sold the CI ecstasy pills for $40.  (Id.).  Again, the CI met with agents and turned over the pistol and drugs and recording equipment.  (Id.).  The drugs tested positive for controlled substances, and the Beretta was determined to have been stolen in Newton County, Georgia on January 3, 2018.  (Id.).

On July 31, 2018, the CI contacted Jackson via text message and negotiated the purchase of $100 in cocaine, $40 in ecstasy pills, and $40 in marijuana.  (Id.).  On August 1, 2018, the agents and officers again met with the CI, searched him, provided government funds and recording equipment.  The CI traveled to and entered the Grocery and saw Jackson.  Jackson sold the CI marijuana $40 and then called Boo, his brother, who instructed Jackson to bring the CI to "the house."  (Id.).  Jackson and the CI traveled to 1167 Fenwood Street, S.W., Atlanta, where Jackson exited the vehicle and walked to the back door, exiting the house a few minutes later.  He sold the CI cocaine for $100 and advised that "his brother" had pills.  (Id.).  The CI, after returning

AO 72A
(Rev.8/82)

to the Grocery briefly, met with the agents who secured the drugs and recording equipment.  The drugs tested positive for controlled substances.  (Id.).

On September 14, 2018, after meeting with the agents and officers as before, the CI traveled to the Grocery where he met with Jackson who sold the CI marijuana for $40.  The CI asked if Jackson had a gun and powder (cocaine) to sell, and Jackson responded, yes, but that they would have to go the house (1167 Fenwood Street) for the cocaine because "'Boo' was babysitting at the house." (Id.).  Another unidentified man provided a firearm, a Taurus model PT 111 Millennium G2, 9mm pistol, to Jackson who ejected the magazine and chambered round.  He sold the pistol to the CI for $300.  The male also provided Jackson with Percocet pills which Jackson sold to the CI for $50.  (Id.).  Jackson and the CI then traveled to 1167 Fenwood Street where Jackson exited the vehicle and entered the residence.  Jackson returned to the vehicle and sold the CI cocaine for $100.  They returned to the Grocery.  The CI departed and again met with the agents to surrender the drugs, firearm and recording equipment. (Id.).  The drugs tested positive for controlled substances.  (Id.).

Based on this information, in the affidavit, Inv. Ernest asserted that in the residence there is: "Marijuana, Cocaine, Ecstasy and other illegal narcotics, weapons, ammunition, money/assests [sic] derived from drug sales or which is defined as

contraband under Georgia State law, notebooks, binders, or papers depicting pay-owe sheets or evidence of narcotic possession or distribution, packaging and measuring equipment used in the drug trade, and other tangible evidence, such as cell phones in the possession of those inside the residence, being held in violation of Georgia state law." (Id.).

On September 26, 2018, ATF agents and local law enforcement officers executed the search warrant for 1167 Fenwood Street.   (Tr. at 4-5, 25, 41). Approximately seven agents approached the front door of the residence and knocked and announced that they were police officers.[2]  When no one answered the door, a ram was used to force open the door, and the agents entered the residence.  (Tr. at 5, 27-28).  Upon entering, with their weapons drawn, the agents and officers again identified themselves as police officers and ordered the occupants to come out with their hands up.  (Tr. at 5, 28).  Defendant Hardwick and a female, Ms. Nicholson, with a small child, exited from the rear of the residence and walked down the hallway with their hands up.  (Tr. at 5, 28-29).  Defendant and Ms. Nicholson, with the child, were directed out of the residence, and Defendant was handcuffed behind his back and

---

[2]A number of other officers were present to guard the perimeter of the residence. (Tr. at 27).

placed in the rear seat of a APD SUV located on the street in front of the residence.[3] (Tr. at 6, 29).

After the residence was secured, about twenty minutes after Defendant was placed in the vehicle, the agents and officers holstered their firearms and ATF Agents Quinton Marable and Alan McLeod spoke to Defendant as he remained partially seated in the back of the SUV with the door open.  (Tr. at 6-7, 29-30).  During the two interviews with Defendant, who remained handcuffed, the agents never drew their weapons, never threatened Defendant, used a conversational tone, and did not initially advise Defendant that he was under arrest.[4]  (Tr. at 6-7, 10, 34).  The agents began the interview by asking Defendant his name and where he lived.  (Tr. at 8, 11-12; 1st Interview).  The agents had never encountered Defendant before; he was not a target; and therefore, they needed to identify him in order to confirm his identity and be able to run a criminal history background check on Defendant.[5]  (Tr. at 11-12).  These questions were part of the routine to begin an interview. (Tr. at 12).  When Defendant

---

[3]People nearby were watching the police activity.  (Tr. at 6).

[4]Both interviews were recorded.  (Tr. at 10-11; Gov't Exh. 1a ("1st Interview") and 1b ("2nd Interview")).

[5]The agents conducted a criminal history check on Defendant while at the residence and determined that he was a convicted felon.  (Tr. at 24).

8

provided another address as his residence, not 1167 Fenwood Drive, the agents asked if he had "any property in here [the house]," and Defendant responded, "my shoes, clothes and my weed." (Tr. at 8, 32; 1st Interview).

At that point, the agents advised Defendant that, because he was in custody and they wanted to ask him questions, they were going to advise him of his <u>Miranda</u> rights and that at any point Defendant did not have answer any questions.[6] (Tr. at 8, 32; 1st Interview). The agents asked Defendant if he had been arrested before, and Defendant responded, yes. The agents asked if Defendant was on parole or probation, and Defendant responded that he was on probation for terroristic threats. (Tr. at 24, 38; 1st Interview). Agent McLeod advised Defendant of his rights by informing him that he had the right to remain silent, that anything he said could be used against him in court, that he had the right to consult with a lawyer before any questioning and to have a lawyer present during questioning, and that, if he could not afford a lawyer, one will be appointed for him before any questioning. (1st Interview). The agent asked Defendant if he understood his rights, and Defendant responded, yes. (<u>Id.</u>). The agent asked Defendant if he would waive his rights and talk, stating again that at anytime

_____

[6]Prior to this time, Defendant had not been given any information about his status. (Tr. at 7).

9

Defendant could state that he did not want to answer a question or did not want to talk anymore. (Id.). Defendant responded, "I want to know why ya'll came in the house." (Tr. at 36; 1st Interview). The agent stated, "Okay, you have to say yes or no and I'll explain to you some stuff." (Id.). Defendant stated, yes, and the agent again told him that at any point Defendant could stop answering. (1st Interview).

Defendant appeared to understand his rights and the questions he was asked; he did not have any questions about his rights; and he was thirty years old and advised the agents that he had a tenth grade education. (Tr. at 8). Defendant appeared to understand English, did not appear to be under the influence of drugs or alcohol, did not appear to have a mental impairment or to be suffering from physical pain or emotional distress. (Tr. at 9). Defendant never requested an attorney and did not invoke his rights during either the first eleven minute interview or second seven minute interview. (Tr. at 9, 13).

Defendant was then advised that the agents had a search warrant for the house because they believed drugs and guns were sold out of the house. (1st Interview). Defendant advised that he did not sell guns, only a little weed and only for a short time. (Id.). After discussing who else lived in the house (Defendant's girlfriend and

10

step children, two girls aged 15 and 9),[7] the agents asked, if the officers had bought

cocaine at the house, who sold it, and, when Defendant denied selling anything but

marijuana, asked, if Defendant did not sell it, who did - his girlfriend or the children.

Defendant continued to deny that he sold cocaine and that he did not know who had

sold the cocaine. (Id.). The agents continued to discuss with Defendant that, while he

claimed to be living in the house for the last six months, cocaine had been sold, and

Defendant continued to deny knowing who sold the drugs. (Id.). When the agents

stated that everything (implying, contraband) found in the house belonged to either

Defendant or his girlfriend, Defendant responded, "Anything in there is mine . . . ."

(Id.). The agents continued to express to Defendant that they wanted to determine who

was responsible and were not trying to have Defendant take the blame, if he was not

responsible. Defendant responded that he was responsible. (Id.).

When asked how much marijuana was in the house, Defendant responded,

"ounce or two" which would be found in the kitchen and denied that any cocaine was

in the house. (Id.). When asked about firearms, Defendant responded that there were

probably two firearms in the house but that did not include a rifle that the agents had

---

[7]The small child with Defendant and Ms. Nicholson that day was Defendant's
daughter. (Tr. at 44-45). Defendant babysat his child and Ms. Nicholson's daughters
while Ms. Nicholson worked. (Tr. at 33-34, 44-46).

found in a closet which belonged to a friend.  The two handguns were in the bedroom. (Id.).  The agents asked about Defendant's prior convictions and why did he have the guns.  He responded, "for protection," even though he knew he was not supposed to have them.  (Id.).  He stated that due to the crime in the community, he bought the guns on the street for protection either for cash or in trade for weed.  (Id.).  Defendant denied knowing about any other drugs.  (Id.).

He expressed that he was frustrated, that he would have opened the door for the agents and that they did not have to knock it down.  (Id.).  The agents explained that they announced themselves, pretty loud, saw movement in the house, and that Defendant was not in the front room when they entered.  (Id.).  Defendant was asked if he wanted some water, and he said, yes.  The agents also asked Defendant if he was taking any medications, was injured, has been mistreated or threatened, was high or had drank alcohol, and Defendant responded no to each question.  (Id.).  Defendant again said that everything in the house was his, not "hers."  (Id.).  He asked if he could smoke a cigarette and was told not right then but that the agents would get him some water.  (Id.).

The first interview was concluded at that time.  The agents then continued with the search of the residence.  (Tr. at 12).  During the execution of the search warrant,

12

the agents located two cellular telephones and an iPad in the master bedroom of the residence.  (Tr. at 14-15; Gov't Exhs. 4-5, 7-10 ("Photos")).  Agent Marable testified that, based on his experience in prior drug investigations, electronic devices had been seized and found to contain evidence of drug trafficking, such as, text messages concerning buying and selling drugs and photographs, and that, if not seized, the devices could be lost or stolen.  (Tr. at 15-16).  The devices were located in proximity to drugs and drug paraphernalia, such as, pills and firearms.  (Tr. at 18; Photos).  The agents also located ammunition during the search which Agent McLeod associated with drug dealing and firearms and which was unlawful for Defendant to possess because he was a convicted felon.  (Tr. at 23-24).  The agents also conducted a second interview with Defendant.

The agents advised Defendant of what they had found during the search, including four handguns, and Defendant explained that the pink pistol was bought by and belonged to his girlfriend but that the other three guns were his.  The agents also told Defendant that they found cocaine in baggies in the drawer with a firearm and in a book bag.  Defendant expressed surprise.  (Tr. at 34-35; 2nd Interview).  The agents then explained to Defendant the amount of federal time that he was potentially facing and sought Defendant's cooperation against other individuals.  (Tr. at 35; 2nd

13

Interview).  Defendant responded, "I ain't got no information on nobody else."  (2nd

Interview).  He advised that he had been on disability for twelve years, and the agent

advised that, if locked up in the federal system, the disability checks would stop.  The

agent said that he was not threatening Defendant but advising him of the facts.  (Id.).

The agent explained that with the firearms and drugs found in the house and

Defendant's criminal history, including two possession with intent to distribute

convictions, he was facing five to fifteen years and that Defendant could help himself

by cooperating against other individuals.  The agents explained that now was the time

to decide to cooperate because he would not be able to do so after he went to jail and

that they were only asking for names, phone numbers and addresses.  (Id.).  Defendant

did not respond.  (Id.).  The agent asked Defendant if he had any names in his cell

phone (that is, the one seized from his person) at that time and would Defendant give

them consent to search his phone.  Defendant refused consent, and the agents advised

that they would obtain a search warrant.  (Id.).

Defendant again stated, "Whatever you got, that's mine. . . .  All I want to do is

tell my old lady I'm sorry" and tell the kids that he loved them.  (Id.).  Defendant asked

to go to the jail at that time but the agents explained that they had to complete the

14

search first in order to know what charges to file.  (<u>Id.</u>).  The second interview ended. (<u>Id.</u>).[8]

On October 22, 2018, Agent Marable obtained a federal search warrant for the three cellular telephones and iPad for evidence related to violations of 18 U.S.C. §§ 922(g)(1) and 924(c)) and 21 U.S.C. § 841(a)(1), for the period of March 26, 2018, through September 26, 2018.  (Tr. at 18; Gov't 12 ("Federal Warrant")).  In the affidavit in support of the search warrant, Agent Marable provided information about his training and experience and, based on that training and experience, the practices engaged in by drug traffickers.  (Tr. at 18; Gov't Exh. 11 ("Federal Affidavit") ¶¶ 2, 11-15).  With respect to the search of the electronic devices, the agent opined that drug traffickers use electronic devices to maintain customer and associate lists and contact information, to communicate with others involved in drug trafficking and to keep photos and other information about drug trafficking.  Also, drug traffickers maintain multiple cellular telephones.  (Federal Affidavit ¶ 13).  The agent then provided information about the two controlled purchases of cocaine from the residence at 1167

---

[8]The agent mentioned a couple of times giving Defendant time to think about whether he wanted to cooperate and speaking to him again but apparently there was no third interview.  (<u>Id.</u>).

15

Fenwood Street and the execution of the state search warrant on September 26, 2018. (Id. ¶¶ 16-17).

The agent recounted the interview with Defendant, after he waived his Miranda rights, including that Defendant stated he was a convicted felon on probation, that he had lived at the Fenwood Street residence for six months, that he sold drugs and that everything in the house, excepting a pink pistol, belonged to him, including two ounces of marijuana that he intended to sell and three firearms in the bedroom.  (Id. ¶ 18). Defendant also admitted knowing that he was not allowed to be around guns but kept them for protection and bought them on the street.  Defendant also said that he had traded drugs for guns.  (Id.).  The agent further stated that, during execution of the search warrant, agents found four firearms, one of which had recently been stolen; controlled substances - marijuana, cocaine pills; paraphernalia - loaded high capacity magazines/ammunition; and mail addressed to Defendant at the residence. (Id. ¶ 19). The agent opined that, because the items were found throughout the residence, "the entire residence was used as a base of operation for the distribution of controlled substances."  (Id. ¶ 20).

The agent stated, based on his training and experience, that the seized electronic devices can serve as a wireless telephone, digital camera, media player, GPS

navigation device and personal digital assistant; that information stored on the devices can reveal who possessed or used the devices; and that the devices can store names and phone numbers or a call log, can send and receive text messages and emails, and can send and receive other types of data all of which can identify coconspirators and customers.  (Id. ¶ 21).

Additional information will be set forth as necessary during discussion of Defendant's motions to suppress.

## II.    Discussion

### a.    State Search Warrant

Defendant's primary argument in seeking suppression of the cellular telephones, iPad and SD card ("electronic devices") and ammunition seized during execution of the state search warrant at 1167 Fenwood Street, Atlanta, Georgia, on September 26, 2018, and any evidence obtained flowing from that seizure, is that the seizure of those items was outside the authorized scope of the warrant.  [Doc. 28 at 10-16].  Defendant argues that the warrant did not include any reference to electronic devices or the ammunition.[9]  [Id.].  The Government responds that the electronic devices were

_____

[9]Defendant also makes a conclusory argument, without offering any legal authority in support, that the search warrant failed to provide any list of items to be seized.  [Id. 10, 15-16].  Defendant's argument is not persuasive nor based on a

lawfully seized because of exigent circumstances and that the ammunition was seized

pursuant to the plain view doctrine.  [Doc. 29 at 7-11].[10]  In reply, Defendant argues

that neither exception applies in this case.  [Doc. 39 at 2-5].

---

common sense reading of the face of the search warrant.  The warrant, while not specifically stating that the following is "the list of items to be seized," provides:  The Superior Court Judge, "[b]ased upon the affidavit given under oath or affirmation . . . [was] satisfied that there is probable cause to believe that a crime is being committed or has been committed and that the property described above is presently located on the person, premises, or property described above."  (State Warrant).  The premises "described above" is the residence located on Fenwood Street, and the "property described above" is: "Marijuana, Cocaine, and Ecstasy and any other illegal narcotics, weapons, money/assests [sic] derived from drug sales or which is defined as contraband under Georgia State law, notebooks, binders, or papers depicting pay-owe sheets or evidence of narcotics possession or distribution, packaging and measuring equipment used in the drug trade, and other tangible evidence being held in violation of Georgia state law."  (Id.).  The court finds that this statement sufficiently apprised the law enforcement officers conducting the search of the items to be seized.  See United States v. Wuagneux, 683 F.2d 1343, 1348-49 (11th Cir. 1982) ("A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized."); United States v. Thornhill, 20 F. Supp. 2d 1377, 1379 (M.D. Ga. 1998) ("Elaborate specificity in a warrant is not necessary. A description is sufficiently particular when it enables a searcher to reasonably ascertain and identify the items authorized to be seized.").

[10]Because the Government is not relying on the reference to electronic devices in the application/affidavit for the search warrant to justify seizure of the electronic devices as being incorporated into the search warrant to authorize seizure, the court will not address Defendant's arguments based on Groh v. Ramirez, 124 S. Ct. 1284 (2004).  [Doc. 28 at 15-16; Doc. 39 at 2].

18

"In order to have evidence suppressed based on a violation of the Fourth Amendment, a [defendant] has the burden of proving (1) that the search was unlawful and (2) that the [defendant] had a legitimate expectation of privacy." United States v. McKennon, 814 F.2d 1539, 1542 (11th Cir. 1987). And specifically with respect to attacks on searches conducted pursuant to a warrant, "[t]he warrant stands cloaked with a presumption of validity . . . and [a defendant] ha[s] the burden of proof in challenging the validity of its execution or service." United States v. Vigo, 413 F.2d 691, 693 (5th Cir. 1969)[11]; accord United States v. Marx, 635 F.2d 436, 441 (5th Cir. Unit B 1981) (same).

With respect to Defendant's legitimate expectation of privacy, at the conclusion of the evidentiary hearing, the court held that Defendant had demonstrated a legitimate expectation of privacy in the site of the search warrant's execution, 1167 Fenwood Street, in Atlanta, and with respect to the contents of the cellular telephone taken off his person. (Tr. at 48-49). Accordingly, Defendant may challenge the execution of the state search warrant and seek to suppress any items seized from the residence. However, as to the two remaining cellular telephones, the iPad and the SD card,

---

[11]Decisions of the Fifth Circuit rendered before October 1, 1981, are binding upon panels of the Eleventh Circuit. See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

19

Defendant failed to identify any ownership of or control over those devices, and, accordingly, if the items were lawfully seized, he may not challenge any search of the contents of those devices.  (Id.).  Neither party has challenged the court's findings with respect to the scope of Defendant's legitimate expectation of privacy.

"The Fourth Amendment provides, in relevant part, 'no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'"  United States v. Evans, 469 F. Supp. 2d 893, 896 (D. Mt. 2007) (quoting U.S. Const. amend. IV); and see Wuagneux, 683 F.2d at 1348 ("The Fourth Amendment requires that warrants 'particularly describ[e] the place to be searched, and the persons or things to be seized.'") (quoting U.S. Const. amend. IV); United States v. Maali, 346 F. Supp. 2d 1226, 1239 (M.D. Fla. 2004) ("'In order for a search to be reasonable, the warrant must be specific.  Specificity has two aspects:  particularity and breadth.  Particularity is the requirement that the warrant must clearly state what is sought.  Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based.'") (quoting In re Grand Jury Subpoenas Dated December 10, 1987, 926 F.2d 847, 856-57 (9th Cir. 1991)).

The Eleventh Circuit Court of Appeals has stated that:

If a search exceeds the scope of terms of a warrant, any subsequent seizure is unconstitutional.  However, a search may be extensive as reasonably necessary as required to locate the items described in the warrant, and is generally "not limited by the possibility that separate acts of entry or opening may be required to complete the search."

United States v. Jackson, 120 F.3d 1226, 1228 (11th Cir. 1997) (quoting United States v. Martinez, 949 F.2d 1117, 1120 (11th Cir. 1992)).  "The crucial inquiry is always 'whether the search and seizures were reasonable under all the circumstances.'" United States v. Schandl, 947 F.2d 462, 465 (11th Cir. 1991) (quoting Wuagneux, 683 F.2d at 1352).

For the purpose of resolving the pending motions to suppress evidence, the court will assume that seizure of the electronic devices and the ammunition did not fall within the scope of the items to be seized specifically authorized by the state search warrant.  However, the Government contends that the items were properly seized either due to exigent circumstances or pursuant to the plain view doctrine.  Under the circumstances presented in this case, the court finds that it need not address the Government's arguments concerning exigency because both the electronic devices and ammunition were lawfully seized pursuant to the plain view doctrine.

If an exception to the warrant requirement is established, items exceeding the scope of a lawful warrant may be seized.  One such exception is the plain view doctrine.  See Horton v. California, 110 S. Ct. 2301, 2306 (1990); United States v. Hamie, 165 F.3d 80, 83 (1st Cir. 1999) ("As the Supreme Court has stated, [a]n example of the applicability of the plain view doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character.") (quoting Coolidge v. New Hampshire, 91 S. Ct. 2022, 2037-38 (1971)) (internal quotation marks omitted).  "An officer may seize evidence that is in plain view despite the failure to obtain a search warrant if two elements are satisfied: (1) lawful access to the object seized, and, (2) the incriminating nature of the object seized is immediately apparent." United States v. Hromada, 49 F.3d 685, 690 n.11 (11th Cir. 1995) (citing Horton, 110 S. Ct. at 2308); and see United States v. Folk, 754 F.3d 905, 911 (11th Cir. 2014) (same); United States v. Susini, 261 Fed. Appx. 270, 273 (11th Cir. 2008) ("[I]t is well-settled that 'objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced into evidence.'") (quoting Harris v. United States, 88 S. Ct. 992, 993 (1968)); United States v. Simpson, 259 Fed. Appx. 164, 165-68 (11th Cir. 2007) (upholding plain view seizure

22

of a backpack containing marijuana when officers were inside the residence conducting consent search to look specifically for weapons and injured persons).

"The incriminating nature of an item is 'immediately apparent' if the officers have 'probable cause' to believe that the item is either evidence of a crime or contraband." United States v. Buchanan, 70 F.3d 818, 826 (5th Cir. 1995) (citing Arizona v. Hicks, 107 S. Ct. 1149, 1153 (1987)); and see Susini, 261 Fed. Appx. at 273 (same). "Probable cause does not require certainty. . . .  In reviewing probable cause determinations, [a court] must consider the totality of the circumstances-including the officers' training and experience as well as their knowledge of the situation at hand." Buchanan, 70 F.3d at 826; see also Craig v. Singletary, 127 F.3d 1030, 1042 (11th Cir. 1997) ("Because 'sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment,' . . . 'probable cause itself is a doctrine of reasonable probability and not certainty[.]'") (citation omitted). "[A] police officer may draw inferences based on his own training and experience in deciding whether probable cause exists . . . ." United States v. Reeves, 604 Fed. Appx. 823, 827 (11th Cir. 2015); and see United States v. Edwards, 2010 WL 5184784, at *9 (N.D. Ga. October 13, 2010) (in finding that documents containing names and telephone numbers were properly seized pursuant to the plain view doctrine, the court noted that "[i]n

23

considering whether probable cause exists, the observations and experiences of the law enforcement officers working a case must be weighed as a part of the totality of the circumstances that might create probable cause"), adopted by United States v. Jones, 2010 WL 5276983 (N.D. Ga. December 15, 2010).  There is no dispute that the agents and officers were lawfully in the Fenwood house when they observed the electronic devices.

Agent Marable testified that, during the execution of the search warrant, the agents located two cellular telephones and an iPad in the master bedroom of the residence. (Tr. at 14-15; Photos).  He further testified that, based on his experience in prior drug investigations, such devices had been seized and found to contain evidence of drug trafficking, such as, text messages concerning buying and selling drugs and photographs, and that, if not seized, the devices could be lost or stolen.  (Tr. at 15-16).  The devices were located in proximity to drugs and drug paraphernalia, such as, pills and firearms.  (Tr. at 18; Photos).  Also, during the investigation of this case, the court notes that the CI's contact for drugs, Jackson, provided a cellular telephone number for the CI to use (which was used) in arranging further transactions and that Jackson contacted "Boo" to arrange the delivery of cocaine from the Fenwood Street house using a telephone.  (State Affidavit).

24

In <u>United States v. Lisbon</u>, 835 F. Supp. 2d 1329 (N.D. Ga. 2011), the court

upheld the plain view seizure of cellular telephones pursuant to the plain view doctrine.

The court first noted that "the Eleventh Circuit and numerous other federal appellate

courts recognize that cell phones are 'a known tool of the drug trade.'" <u>Id.</u> at 1363

(listing cases).  The court also noted that this reasoning was all the more persuasive

where, as in the case before this court, "drug conspirators were shown to utilize cell

phones to communicate with one another." <u>Id. And see</u> <u>United States v. Jaimez</u>, 15 F.

Supp. 3d 1338, 1343 (N.D. Ga. 2013) (upholding plain view seizure of cellular

telephones and finding "that the incriminating nature of the cellular phones was

immediately apparent" in a case involving wiretaps, indicating use of phones, and

where several phones were located in one place, "suggesting in this context that the

phones were used for drug sales"); <u>United States v. Rodriguez-Alejandro</u>, 664 F. Supp.

2d 1320, 1345-46 (N.D. Ga. 2009) (upholding plain view seizure of four cellular

telephones found in proximity to the defendant, who was being arrested for drug

offenses, based on the agent's testimony that the phones constituted evidence in a drug

investigation - recognizing "the incriminating nature of the cell phones in a drug

investigation");[12] <u>United States v. Meador</u>, 2008 WL 4922001, at **14-15 (E.D. Mo. January 7, 2008) (upholding plain view seizure of cell phones, "well-known and recognized tools of the drug dealing trade[,]" when found in the defendant's vehicle along with marijuana, when the defendant was implicated in marijuana trafficking, and when there was evidence of usage of the cell phone).

Likewise, the ammunition found in the Fenwood Street house was properly seized under the plain view doctrine either as contraband or evidence of drug trafficking. Agent Marable testified that the agents found (besides a pink pistol belonging to Ms. Nicholson and the rifle belonging to a "friend") three firearms in the bedroom of the Fenwood Street house and also located ammunition near the firearms and drugs during the search. Agent McLeod associated the ammunition with drug dealing and firearms and stated that it was unlawful for Defendant to possess the ammunition because he was a convicted felon. (Tr. at 14-15, 18, 23-24). Additionally,

---

[12]The court also rejected the defendant's argument that, because another individual was also present in the room in which he was arrested and the phones were found, the agents could not know to whom the phones belonged without further examination. <u>Id.</u> The court stated, "Although the agents could not immediately ascertain whether all four cell phones *belonged* to [the defendant], the phrase immediately apparent does not imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the plain view doctrine." <u>Id.</u> at 1346 (citation and internal quotation marks omitted; emphasis in original).

26

during the investigation, as set forth in the state affidavit, Defendant's associate, Jackson, sold firearms to the CI and was observed in possession of a firearm during the drug transactions with the CI. (State Affidavit). While the state warrant was being executed, the agents also obtained Defendant's criminal history which showed that he was a convicted felon. (Tr. at 24; 2nd Interview (discussion of Defendant's prior felony convictions for possession with intent to distribute drugs - convictions that Defendant had not previously revealed to the agents)). And, after Defendant waived his <u>Miranda</u> rights, he also discussed with the agents that he had been convicted and that he knowingly unlawfully possessed the firearms and had traded firearms for marijuana in the past. (1st Interview).[13]

Defendant's attempt to separate the firearms seized pursuant to the search warrant from the ammunition found along with the firearms and drugs is not persuasive, irregardless of the fact that, as a convicted felon, Defendant could not lawfully possess the ammunition - it was contraband. In <u>United States v. Folk</u>, 754 F.3d 905 (11th Cir. 2014), the Eleventh Circuit Court of Appeals stated, "This circuit has routinely recognized that firearms can be so connected to the sale of narcotics that

---

[13]The court is not relying on Defendant's statements about being on probation for terroristic threats made after he was advised that he was in custody but before being advised of and waiving his <u>Miranda</u> rights. (Tr. at 32; 1st Interview).

AO 72A
(Rev.8/82)

their seizure is implicitly authorized by a warrant to search for narcotics." Id. at 910-12 (although in Folk the court found that the firearms that were seized, which the agent believed "were probably used for hunting rather than as tools of the drug trade[,]" did not fall within the usual case, the court nonetheless upheld the seizure of the firearms under the plain view doctrine because the firearms "reasonably appeared to be in the possession of a convicted felon" and "qualifie[d] as contraband"); and see United States v. Prather, 279 Fed. Appx. 761, 766 (11th Cir. 2008) ("When law enforcement officers stumble across hidden guns during a lawful search for drugs, they are allowed to draw the reasonable inference that the guns may be related to drug trafficking occurring at the location."); United States v. Acosta, 807 F. Supp. 2d 1154, 1261 (N.D. Ga. 2011) ("Due to the fact that firearms are tools of the drug trade, the firearms were properly seized as evidence in plain view."). Similarly, in United States v. Coffell, 720 Fed. Appx. 521 (11th Cir. 2017), applying the decision in Folk, the court found that, under the facts in that case, the authorization to search for drugs did not implicitly authorize the seizure of firearms, ammunition and a silencer observed in plain view during the search but nonetheless upheld the seizure of the items under the plain view doctrine. Id. at 524-25. Because the searching officers were aware that the defendant was a convicted felon and reasonably believed that the items belonged to the

28

defendant, the firearm, silencer and ammunition were contraband - items that cannot be possessed by a convicted felon.  Id. at 525 (citing 18 U.S.C. § 922(g)).

In United States v. Hines, 2019 WL 1116780 (N.D. Fla. March 11, 2019), the district court upheld the plain view seizure of a firearm and ammunition located during the execution of a search warrant of a residence for evidence of suspected narcotics violations.  Id., at *1.  During the search, along with drugs and drug paraphernalia, in the close proximity, the officers seized a firearm and ammunition.  Id., at **1, 3.  The court upheld the plain view seizure on two grounds.  First, the seizure was justified as contraband due to the defendant's status as a convicted felon.  Id., at *3.  And the court held that the "officers also had probable cause to believe that the gun [and ammunition] was contraband because there was evidence that it was being possessed in furtherance of drug trafficking[,]" noting specifically the close proximity to suspected illegal drugs and the prior controlled buys.  Id.; and see United States v. Armstrong, 554 F.3d 1159, 1163 (8th Cir. 2009) (finding that the handgun's and ammunition's "incriminating nature w[ere] immediately apparent" when found in proximity to small digital scale, razor blade with cocaine residue and small bags, all of which evidenced drug trafficking because "it is unlawful to use, carry, or possess a firearm [or ammunition] in furtherance of a drug trafficking crime"); United States

29

v. Gamble, 388 F.3d 74, 76 (2nd Cir. 2004) (finding that "ammunition clip was connected with criminal activity because ammunition is a recognized tool of the drug-dealing trade" and was properly seized in plain view during search warrant for cocaine and drug paraphernalia-items); United States v. Cooper, 19 F.3d 1154, 1163 (7th Cir. 1994) (finding that empty ammunition box was properly seized under the plain view doctrine during execution of a search warrant arising out of sales of drugs from the defendant's apartment and stating that the ammunition box "is probative of weapons possession and drug dealing" because the "empty ammunition box raises an inference that the contents had been used in a firearm[; t]he district judge correctly stated that 'you can't have one without the other'") (no citation provided).

Accordingly, the court recommends that Defendant's motions to suppress the electronic devices and ammunition seized during the execution of the state search warrant be denied.

### b.      Federal Search Warrant

Defendant also contends that the search authorized by the federal search warrant, for the time period starting March 2018, exceeded the temporal scope of the probable

cause set forth in the affidavit.  [Doc. 20-22].[14]  Defendant claims that the affidavit

only established probable cause to search the cellular telephone taken off his person[15]

from August 1, 2018, when the first controlled buy occurred at the Fenwood Street

residence.   [Id.].   The Government responds arguing that Defendant's argument

presents too narrow a view of the probable cause established in this case.  [Doc. 29 at

18-20].  Defendant's reply does not add materially to the discussion.  [Doc. 39 at 8-10].

The issuing magistrate judge, in deciding whether to sign a search warrant, is

"'simply to make a practical, common sense decision whether, given all the

circumstances set forth in the affidavit before him, including the veracity and the basis

of knowledge of persons supplying hearsay information, there is a fair probability that

contraband or evidence of a crime will be found in a particular place.'"  United States

v. Jiminez, 224 F.3d 1243, 1248 (11th Cir. 2000) (quoting Illinois v. Gates, 103 S. Ct.

---

[14]As far as the court is aware, the Government has been unable to obtain any
information of an evidentiary value from any the electronic devices.

[15]Defendant appears to challenge the federal search warrant as to all of the
cellular telephones, the iPad and SD card seized on September 26, 2018.  [Doc. 28 at
20-21; Doc. 39 at 8-10].  As noted supra, although Defendant could challenge the
seizure of all of the electronic devices, he did not establish a legitimate expectation of
privacy in the remaining two cellular telephones, the iPad or the SD card and,
therefore, cannot challenge a warrant seeking the contents of those devices.  (Tr. at 48-
49).

31

2317, 2332 (1983)) (internal quotation marks omitted).  In this regard, "'probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts[.]'"  United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) (quoting Gates, 103 S. Ct. at 2329).  For this reason, "[c]ourts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations."  United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994) (citing Gates, 103 S. Ct. at 2331-32; United States v. Ventresca, 85 S. Ct. 741, 746 (1965)); accord United States v. Hatcher, 300 Fed. Appx. 659, 663 (11th Cir. 2008) (same).  In reviewing the issuance of a search warrant, the undersigned must determine only that the issuing judge had a "substantial basis" for concluding that probable cause existed to uphold the warrant.  See Gates, 103 S. Ct. at 2331; see also Massachusetts v. Upton, 104 S. Ct. 2085, 2085 (1984) (per curiam).  The validity of the warrant is considered based on the totality of the circumstances.  See Brundidge, 170 F.3d at 1352.

"'The scope of the warrant, and the search, is limited by the extent of the probable cause. . . .  [P]robable cause must exist to seize all the items of a particular

32

type described in the warrant' and '[t]hus, the concept of breadth may be defined as the requirement that there be probable cause to seize the particular thing named in the warrant.'" Maali, 346 F. Supp. 2d at 1239 (citation omitted); see also United States v. Smith, 424 F.3d 992, 1004 (9th Cir. 2005) ("The purpose of the breadth requirement is to limit the scope of the warrant 'by the probable cause on which the warrant is based.'") (citation omitted).  The breadth requirement, therefore, prevents "'general, exploratory rummaging in a person's belongings.'" Smith, 424 F.3d at 1004 (citation omitted). See Schandl, 947 F.2d at 465 ("The crucial inquiry is always 'whether the search and seizures were reasonable under all the circumstances.'") (citation omitted).

The temporal scope of the authorized search of the cellular telephone taken off of Defendant's person was reasonable and supported by probable cause.  The affidavit described the two controlled buys of cocaine on August 1, 2018, and September 14, 2018, from the Fenwood Street house and the execution of the state search warrant on September 26, 2018, which resulted in the seizure of four firearms (one of which had recently been stolen), 171 grams of marijuana, cocaine, prescription pills, drug paraphernalia indicating drug sales, loaded high capacity pistol magazines and approximately 100 rounds of  ammunition.  (Federal Affidavit ¶¶ 16, 19).  The affidavit recounted Defendant's statements including that he had lived at the address

33

for six months, that he sold drugs, that everything in the house (except a pink pistol) was his - including three handguns that he knew he could not lawfully possess because of his prior convictions and two ounces of marijuana that he planned to sell, and that he had traded guns for narcotics.  (Id. ¶¶ 17-18).  The agent opined that, because firearms and drugs were found throughout the residence, "the entire residence [where Defendant had lived for six months] was used as a base of operation for the distribution of controlled substances."  (Id. ¶ 20).  The agent also opined that drug traffickers use electronic devices to maintain customer and associate lists and contact information, to communicate with others involved in drug trafficking and to keep photos and other information about drug trafficking.  Also, drug traffickers maintain multiple cellular telephones.  (Id. ¶ 13).  See United States v. Leach, 498 Fed. Appx. 915, 917 (11th Cir. 2012) ("Opinions and conclusions of experienced agents regarding a set of facts are a factor in the probable cause equation.").

The reasonable inferences from the facts set forth in the affidavit is that Defendant was a drug dealer operating out of the Fenwood Street house and that the conduct had been ongoing for some period of time, that is, that Defendant did not just by happenstance acquire and start selling drugs on August 1, 2018, the first date that Jackson and the CI traveled to the residence to buy cocaine.  Defendant's argument

34

that probable cause to search the cellular telephone's contents existed on August 1 but not before simply defies logic under the circumstances before the court. There was probable cause to search for evidence of Defendant's drug trafficking activities for at least the period of time that he resided in the residence. And given the capabilities for storage of information on a cellular telephone, the issuing judge had probable cause to believe that the phone contained evidence related to Defendant's drug dealing activity at least since March 2018. See United States v. Umansky, 291 Fed. Appx. 227, 228 n.1 (11th Cir. 2008) (noting that in reviewing the sufficiency of probable cause for a search warrant, the appellate court "give[s] due weight to the inferences that the judge and law enforcement officers drew from the facts"). Authorizing the search for information back to March 2018, within the approximate six months that Defendant stated he lived in the house, was reasonable.

Additionally, courts routinely reject arguments such as Defendant's that object to either no time period restricting the execution of a warrant or to an allegedly too broad time period authorized by a warrant. In United States v. Harvey, 2015 WL 9685908 (N.D. Ga. November 30, 2015), report and recommendation adopted by 2016 WL 109984 (N.D. Ga. January 8, 2016), the court rejected the defendant's argument that "the warrants were not particularized because they 'failed to provide any time

35

period for which items could be searched.'" Id., at *14.  Relying on the decision in United States v. Lee, 2015 WL 5667102 (N.D. Ga. September 25, 2015), the Harvey court stated, "'[T]he Court finds that the warrants were already adequately particularized based on the subject matter limitation to evidence relating to [unlawful trafficking in firearms and unlawful entry of an airport in violation of security requirements], and therefore an additional temporal limitation was not required.'" Harvey, 2015 WL 9685908, at *14 (quoting Lee, 2015 WL 5667102, at *10).  And see United States v. Broche-Gonzalez, 2007 WL 1455992, at *5 (M.D. Fla. April 11, 2007) (rejecting the defendant's argument that the warrant failed to include dates restricting the scope of the search as unreasonable because the "officers could not plausibly be expected to know the date when the clandestine marijuana growing operation began" and because "there is no indication in this case that the authorized search warrant would encompass an unreasonable time period"); accord United States v. Marvin, 2013 WL 12099042, at **5-6 (W.D. Tex. August 14, 2013) (rejecting the defendant's argument that, although the affiant for the search warrant had information providing a specific time frame for the offenses, the warrant's failure to specify a time period for the search did not render the warrant, which otherwise limited the scope of the search to areas (including electronic devices) where evidence of the offenses under

36

investigation could be found, vague or unreasonable); <u>United States v. Vogel</u>, 2010 WL 2268237, at *7 (E.D. Tex. May 25, 2010) (rejecting the defendant's argument that search warrants "should have been restricted to the time frame covered by the indictment" (returned one year after execution of the warrants) because "the investigation was still ongoing [when the warrants were obtained] and the Government had not yet determined the full scope of the conspiracy[; therefore, t]o anticipate a date range for documents to be sought, when the full scope of the . . . operation was unknown, would be impossible"); <u>United States v. Scott</u>, 83 F. Supp. 2d 187, at 199-200 (D. Mass. 2000) (noting that temporal limitations are but one indicia of particularity, the court held that even though the affidavits for the warrants "describe a specific time frame for the alleged criminal activity, First Circuit law does not require that the search warrants be correspondingly limited").  The warrant in this case, besides specifying the type of documents and information to be searched for on Defendant's cellular telephone, set a fairly narrow time frame, March 26, 2018, to September 26, 2018, to search for evidence of Defendant's drug trafficking activity and was supported by probable cause.

37

For these reasons, the court recommends that Defendant's motions to suppress evidence (if any is ever obtained) from the electronic devices seized during execution of the federal search warrant be denied.

**c.    Statements**

Defendant first argues that, although he was in custody, the agents interrogated him without advising him of his Miranda rights by asking Defendant if anything in the Fenwood Street house was his and if he was on probation or parole.  [Doc. 28 at 19].  Defendant then contends that, with those incriminating responses having been made, his waiver of Miranda rights was not knowing, intelligent or voluntary especially in light of his hearing disability and tenth grade education.[16]  [Id.].  Defendant makes no other arguments in support of finding that his waiver was not valid.  [Id.].  In response, the Government contends that Defendant was not in custody when the interview began and, alternatively, that the initial questions regarding Defendant's residence fell within the routine-booking exception.  The Government does not address the questions about

---

[16]Defendant also states that he has a learning disability, is not sophisticated and has limitations in understanding.  [Id.; Doc. 39 at 8].  The court has carefully reviewed the record, including the two interviews with Defendant, and there is nothing in the record before the court that supports Defendant's contention that he has a learning disability or any other mental incapacity with the exception of having stopped going to school after the tenth grade.  The court will not further address Defendant's unsubstantiated claims of mental impairment.

38

Defendant's status on probation or parole before being advised of his <u>Miranda</u> rights but after being advised that he was in custody.  [Doc. 29 at 11-16] (Tr. at 6-8, 11-12, 28-30, 32; 1st Interview).  And the Government contends that Defendant voluntarily, knowingly and intelligently waived his <u>Miranda</u> rights.  [<u>Id.</u> at 16-18].  In reply, Defendant contends that, being in custody, the pre-<u>Miranda</u> questioning concerning his association with the residence and his criminal history did not constitute routine booking questions and that he did not subsequently voluntarily waive his <u>Miranda</u> rights.  [Doc. 39 at 5-8].

The court will address Defendant's statements in three parts:  the pre-<u>Miranda</u> question about Defendant's residency; the pre-<u>Miranda</u> question about Defendant's probation and parole status; and the post-<u>Miranda</u> questioning following the waiver of his rights.

In <u>Miranda v. Arizona</u>, 86 S. Ct. 1602 (1966), the Supreme Court held that "a person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'"  <u>Stansbury v. California</u>, 114 S. Ct. 1526, 1528 (1994)

39

(quoting <u>Miranda</u>, 86 S. Ct. at 1612).  The Supreme Court recently clarified "that the freedom-of-movement test identifies only a necessary and not a sufficient condition for <u>Miranda</u> custody." <u>Maryland v. Shatzer</u>, 130 S. Ct. 1213, 1224 (2010).  The Court stated, "We have declined to accord it 'talismanic power,' because <u>Miranda</u> is to be enforced 'only in those types of situations in which the concerns that powered the decision are implicated.'" <u>Id.</u> (quoting <u>Berkemer v. McCarty</u>, 104 S. Ct. 3138, 3148-49 (1984)).  Accordingly, "[a]n officer's obligation to administer <u>Miranda</u> warnings attaches . . . 'only where there has been such a restriction on a person's freedom as to render him in custody.'" <u>Stansbury</u>, 114 S. Ct. at 1528 (quoting <u>Oregon v. Mathiason</u>, 97 S. Ct. 711, 714 (1977) (per curiam)); <u>accord</u> <u>United States v. Brown</u>, 441 F.3d 1330, 1347 (11th Cir. 2006).

This determination "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."[17] <u>Stansbury</u>, 114 S. Ct. at 1529; <u>accord</u> <u>United States v. Street</u>, 472

---

[17]While "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned[,]" <u>Stansbury</u>, 114 S. Ct. at 1529-30, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was in custody at a particular time . . .," <u>United States v. Lall</u>, 607 F.3d 1277, 1284 (11th Cir. 2010) (citation and internal quotation marks omitted).

F.3d 1298, 1309 (11th Cir. 2006) (same).  The objective factors to be considered include "'whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled, as well as the location and length of the detention.'"  United States v. Riquene, 552 Fed. Appx. 940, 942 (11th Cir. 2014) (quoting United States v. Luna-Encinas, 603 F.3d 876, 881 & n.1 (11th Cir. 2010).  "'[U]nder the objective standard, the reasonable person from whose perspective custody is defined is a reasonable innocent person.'" Street, 472 F.3d at 1309 (citation omitted); see also Brown, 441 F.3d at 1347 (same); United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996) ("Whether a defendant knows he is guilty and believes incriminating evidence will soon be discovered is irrelevant.").

The circumstances of the initial questioning before the court fall outside "the Miranda paradigm[,]" United States v. Ellison, 632 F.3d 727, 729 (1st Cir. 2010), that is, interrogation of a suspect at the police station, or similar circumstances establishing the functional equivalent of an arrest requiring Miranda warnings.  While Defendant was clearly detained, Defendant mistakes being detained or not free to leave with the level of custody necessary to trigger Miranda warnings, which was not reached in this

41

case at the time Defendant was initially questioned.  Applying the test set forth in

Shatzer to an investigative detention, the Eleventh Circuit Court of Appeals explained:

> [A]lthough a reasonable person in the defendant's position may feel
> constrained not to leave the scene of a police encounter at a particular
> moment – and thus may be deemed to have been "seized" by law
> enforcement – he will not necessarily be considered in "custody" for Fifth
> Amendment purposes. . . .
>
> Rather, "a free-to-leave inquiry reveals *only* whether the person
> questioned was seized.". . . While "seizure is a necessary prerequisite to
> Miranda, . . . a court must [also] ask whether . . . a reasonable person
> would have understood his freedom of action to have been curtailed *to a*
> *degree associated with formal arrest*."

Luna-Encinas, 603 F.3d at 881 (citations omitted; emphasis in original).

After consideration of the facts surrounding Defendant's detention and the

question posed to him about his residency, the court finds that Defendant was not in

"custody" when the question was asked, therefore, Miranda warnings were not

required.  The fact that Defendant was physically detained and handcuffed while the

search warrant was executed does not necessitate a finding that Defendant was under

arrest or in "custody."  In fact, in Michigan v. Summers, 101 S. Ct. 2587 (1981), "for

Fourth Amendment purposes, [the Supreme Court held] that a warrant to search for

contraband founded on probable cause implicitly carries with it the limited authority

to detain the occupants of the premises while a proper search is conducted."  Id. at

42

2595.  Such a detention is not automatically the equivalent of a formal arrest.  Id.; and

see Sampson v. City of Brunswick, 549 Fed. Appx. 858, 860 (11th Cir. 2013) (rejecting

the plaintiffs' claims that their temporary detention (six-hours while the search warrant

was diligently executed) was unlawful and stating that "the Supreme Court has

established that police officers have a 'categorical' right to detain occupants of a

premises while executing a search warrant for contraband").  The rationale for

allowing the temporary detention in Summers, that is, "preventing flight in the event

that incriminating evidence is found," "minimizing the risk of harm to the officers[,]"

and facilitating "orderly completion of the search[,]" 101 S. Ct. at 2594, is applicable

to the facts of this case indicating that, while Defendant may not have been free to

leave, he was not under formal arrest.

Furthermore, simply because Defendant's liberty was restrained by the use of

handcuffs during the execution of the search warrant does not convert the detention

into an arrest requiring Miranda warnings before Defendant is questioned.  See, e.g.,

United States v. Davis, 530 F.3d 1069, 1081 (9th Cir. 2008) ("Where an individual has

been detained incident to a search warrant, and officers' questioning stays within the

bounds of questioning permitted during a Terry stop[, that is, asking a limited number

of questions to determine identity and to obtain information to confirm or dispel

43

suspicions], Miranda rights are not required."); United States v. Burns, 37 F.3d 276, 281 (7th Cir. 1994) ("While detention during the execution of a search warrant is not a traditional Terry stop, it is sufficiently analogous for us to conclude that, in the usual case, Miranda warnings are not required."); United States v. Pointer, 2012 WL 12862849, at **1-3 (N.D. Ala. October 23, 2012) (defendant, although seized, was not in custody for purposes of Miranda during execution of search warrant at his place of employment, when upon entering twelve to fifteen officers displaying weapons loudly ordered everyone to get on the floor and handcuffed several individuals including the defendant and the defendant remained seated and handcuffed as search was conducted; the court concluded that the "detention was temporary, lasting only until the search was concluded or something illegal was found"), report and recommendation adopted by 2012 WL 12863952 (N.D. Ala. November 20, 2012); United States v. Toumasian, 2011 WL 3798223, at **10-11 (N.D. Ga. July 19, 2011) (concluding that the defendant was not in custody for Miranda purposes when six to ten officers, with weapons drawn upon entering and securing the residence, used force to breach the door of the residence, had the defendant lie face down on the floor where he was handcuffed, and then asked the defendant questions while he sat upright against a wall, still handcuffed,

44

in the residence while the search was being executed), report and recommendation adopted by 2011 WL 3738980 (N.D. Ga. August 22, 2011).

In United States v. Calloway, 298 F. Supp. 2d 39 (D. D.C. 2003), the district court found that a defendant was not in custody requiring Miranda warnings while being detained during the execution of a search warrant in his residence when he was asked if there was anything in the residence that the officers should know about. The facts in Calloway are similar to those in the instant case. The officers had to use force to breach both the front door of the residence and the door to the defendant's bedroom where he was found; the officers had weapons drawn when entering the residence and for the ten minutes required to secure the residence, then the weapons were holstered; there were a number of officers present; the defendant's hands were cuffed following standard procedures; the officers explained the reason, that is, to execute the search warrant, for their presence; the detention, at the time the question was asked, was temporary, only ten minutes; and the question was not focused on either the defendant's possessions or conduct, that is, not the type asked during custodial interrogation. Id. at 48-49. The court concluded that, at the time the question about whether there was anything in the residence the officers should know about was asked,

45

the "defendant had not been treated any differently than any other person who is secured by the ERT during the execution of a search warrant." Id. at 49.

Likewise, in this case, the facts do not warrant finding that Defendant's brief detention before being asked the general question about residency established that he was in custody. In order to execute the state search warrant on September 26, 2018, approximately seven agents/officers approached the front door of the residence and knocked and announced that they were police officers.[18] When no one answered the door, a ram was used to force open the door, and the agents entered the residence. (Tr. at 5, 27-28). Upon entering, with their weapons drawn, the agents and officers again identified themselves as police officers and ordered the occupants to come out with their hands up. (Tr. at 5, 28). Defendant Hardwick and a female, Ms. Nicholson, with a small child, exited from the rear of the residence and walked down the hallway with their hands up. (Tr. at 5, 28-29). Defendant and Ms. Nicholson, with the child, were directed out of the residence, and Defendant was handcuffed behind his back and

---

[18]A number of other officers were present to guard the perimeter of the residence. (Tr. at 27).

46

placed in the rear seat of a APD SUV located on the street in front of the residence.[19]

(Tr. at 6, 29).

After the residence was secured, about twenty minutes after Defendant was placed in the vehicle, the agents and officers holstered their firearms and ATF Agents Quinton Marable and Alan McLeod spoke to Defendant as he remained partially seated in the back of the SUV with the door open.  (Tr. at 6-7, 29-30).  During the initial interview with Defendant, who remained handcuffed, the agents never drew their weapons, never threatened Defendant, used a conversational tone, and did not initially advise Defendant that he was under arrest.  (Tr. at 6-7, 10, 34).  The agents began the interview by asking Defendant his name and where he lived.  (Tr. at 8, 11-12; 1st Interview).  The agents had never encountered Defendant before; he was not a target; and therefore, they needed to identify him in order to confirm his identity and be able to run a criminal history background check on Defendant.  (Tr. at 11-12).  These questions were part of the routine to begin an interview. (Tr. at 12).  When Defendant provided another address as his residence, not 1167 Fenwood Drive, the agents asked if he had "any property in here [the house]," and Defendant responded, "my shoes, clothes and my weed."  (Tr. at 8, 32; 1st Interview).

---

[19]People nearby were watching the police activity.  (Tr. at 6).

Defendant was treated no differently than any other occupant of a residence in which a search warrant is being executed.  And "[s]uch limited questioning, not focused specifically on the suspect's conduct or possessions, is not consistent with the type of police conduct that is the functional equivalent of an arrest." Calloway, 298 F. Supp. 2d at 49.  The officers did not exploit Defendant's detention nor unduly prolong the detention in order to gain inculpatory information from Defendant.  See Summers, 101 S. Ct. at 2593-94 (in finding that detention during the execution of a search warrant was reasonable, the Supreme Court relied in part on the conclusion that "the type of detention imposed here is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention").  Defendant was not in custody, and Miranda warnings were not required.

And, even if Defendant was in custody at the time of the question about whether he had any possessions in the residence, he was not subjected to interrogation.  The Supreme Court has held that routine booking questions constitute an exception to the requirement that Miranda rights be given prior to custodial interrogation.  See Pennsylvania v. Muniz, 110 S. Ct. 2638, 2650 (1990).  The Eleventh Circuit Court of Appeals held that "[a]n officer's request for routine information for booking purposes

48

is not an interrogation under <u>Miranda</u>, even though that information turns out to be incriminating." <u>United States v. Sweeting</u>, 933 F.2d 962, 965 (11th Cir. 1991) (quoting <u>United States v. Sims</u>, 719 F.2d 375, 378-79 (11th Cir. 1983) (*per curium*)) (internal quotation marks omitted).  In <u>United States v. Ramirez</u>, 991 F. Supp. 2d 1258 (S.D. Fla. 2014), the court summarized the law governing this exception:

> Under this exception, answers to questions asked for the purpose of securing "'biographical data necessary to complete booking or pretrial services'" are not inadmissible under <u>Miranda</u>. . . .  As the Eleventh Circuit has explained, "An officer's request for 'routine' information for booking purposes is not an interrogation under <u>Miranda</u>, even though that information turns out to be incriminating." . . .  To qualify as a routine-booking question, the question must be "reasonably related to the police's administrative concerns," . . . and the Court must conclude that the question was not intended to elicit an incriminating response. . . . Among other questions that my qualify for the routine-booking exception are those asking for the name, birthdate, and address of the person being questioned. . . .  But the Eleventh Circuit has "emphasize[d] that police may not use routine biographical questioning as a guise for obtaining incriminating information. . . . Even questions that usually are routine must be [preceded] by <u>Miranda</u> warnings if they are intended to produce answers that are incriminating."

<u>Id.</u> at 1265-66 (citations omitted).

The agents only asked Defendant if he had any belongings in the Fenwood residence because he had provided another address as his residence, and they needed to confirm where Defendant resided.  And the question asked, if Defendant had "any

49

property" in the house, could have easily been answered - and a reasonable person would expect to be answered - with a "yes" or a "no" and not with a listing of the items in the residence belonging to him, including, illegal drugs.  There was no reason for the interviewing agents to believe that Defendant's answer to the seemingly innocuous question would be incriminating.

In United States v. Gaston, 357 F.3d 77 (D.C. Cir. 2004), the court held that such questioning fell within the scope of the Supreme Court's decision in Muniz.  Id. at 82.  In that case, after the officers entered the residence and secured in handcuffs the occupants, one officer asked the defendant for his name, address, date of birth and social security number.  When the defendant gave the residence to be searched as his address, the officer asked the defendant if he owned the residence, and the defendant responded that he did, along with his sisters.  Id. at 81.  The court found that, as was the situation in Muniz, the questions posed to the defendant "related to 'administrative concerns'" and "record-keeping."  Id. at 82 (citation omitted).  Because a copy of the warrant had to be left with the person from whom any items were seized or from whose residence any property was taken, see Fed. R. Crim. P. 41, the officers needed to know who resided in the location of the search.  Id.  Accordingly, routine questions about who lived in the residence did not require Miranda warnings.  See also United States

50

v. Glover, 211 Fed. Appx. 811, 814 (10th Cir. 2007) (applying Muniz to questions about residency posed to occupants of residence where search warrant was being executed); and see Toumasian, 2011 WL 3738980, at *12.  Therefore, Defendant's response to the agent's question whether Defendant had any property in the residence did not constitute custodial interrogation and is admissible.

As noted, the Government did not address the admissibility of Defendant's responses to the questions about whether he was on probation or parole made after being advised that he was in custody but before being advised of his Miranda rights. After Defendant stated that he had "weed" in the residence, the agents advised Defendant that, because he was in custody - apparently due to his admission about the drugs - and they wanted to ask him questions, they were going to advise him of his Miranda rights and that at any point Defendant did not have answer any questions. (Tr. at 8, 32; 1st Interview).  The agents asked Defendant if he had been arrested before, and Defendant responded, yes.  The agents asked if Defendant was on parole or probation, and Defendant responded that he was on probation for terroristic threats. (Tr. at 24, 38; 1st Interview).  Agent McLeod then advised Defendant of his rights.  (1st Interview).  Under these circumstances, the court finds that Defendant was in custody and that he was subjected to interrogation when asked about his status of being on

51

parole or probation.  That question was not a routine-booking question under the circumstances.  As evident from the first interview, by the time that the agents spoke to Defendant, a rifle had been located in a closet of the residence.  (1st Interview).  Defendant's responses to questions about his criminal history could be incriminating with respect to his possession of firearms as a convicted felon, and the agents should have realized that fact.  The court cannot, under the circumstances, conclude that "the question was not intended to elicit an incriminating response." Ramirez, 991 F. Supp. 2d at 1265.  Accordingly, Defendant's pre-Miranda response about his status on parole or probation is not admissible.

The final question for the court to address is whether Defendant knowingly, voluntarily and intelligently waived his Miranda rights prior to making the remaining statements during the first and second interviews on September 26, 2018.  Defendant's arguments in support of his motion to suppress his post-Miranda waiver are brief.  In support of the motion to suppress, Defendant argues that as "a legal and practical matter, the Miranda warnings were too late" because the "psychological dynamic of [Defendant's] interactions with the agents had already shifted" due to his acknowledgment that he had drugs in the residence and was a convicted felon.  [Doc. 28 at 20].  Defendant points to the facts that he only completed the tenth grade, that he

lacked hearing in one ear and was on disability income and that he was not aware that his pre-<u>Miranda</u> statements might be suppressible.   [<u>Id.</u>].[20]   Defendant summarily concludes, without further discussion, that his post-<u>Miranda</u> statements should be suppressed "for a lack of a knowing, intelligent and voluntary waiver of his <u>Miranda</u> rights."   [<u>Id.</u>].   In his reply brief, Defendant does not address the Government's arguments beyond stating that Defendant's conduct during the interviews is explained by his "lack of understanding and acquiescence."   [Doc. 39 at 8].   Defendant's arguments are not borne out by the record.   Although Defendant does not cite to the Supreme Court decision in <u>Oregon v. Elstad</u>, 105 S. Ct. 1285 (1985), nor present an argument based on that decision, his assertion in support of suppressing his post-<u>Miranda</u> statements appear to be based on that decision and will be addressed by the court.   The court is only considering the impact of the pre-<u>Miranda</u> statement that Defendant made about being on parole/probation for terroristic threats.

In <u>Street</u>, 472 F.3d 1298, the Eleventh Circuit Court of Appeals explained that "<u>Elstad</u> sets out the general rule that the existence of a pre-warning statement does not require suppression of a post-warning statement that was knowingly and voluntarily

---

[20]As noted previously, Defendant's contentions that he has a learning disability, and was not sophisticated and has limits on his ability to understand [<u>Id.</u>] are not supported by the record and will not be considered by the court.

made . . . ." Id. at 1312[21] (citing Elstad, 105 S. Ct. at 1293).  "The rule of Elstad is that 'the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made. . . .  In making this determination courts are not to presume that the existence of the earlier unwarned statement compelled the defendant to give another one, but instead should assume that ordinarily giving proper Miranda warnings removes the effect of any conditions requiring suppression of the unwarned statement . . . .  Where both confessions are voluntary, there is no justification for suppressing the 'highly probative evidence of a voluntary confession.'"  Id. at 1313 (quoting Elstad, 105 S. Ct. at 1294-96).  The court determines "whether a statement was made voluntarily, and thus was 'the product of an essentially free and unconstrained choice,' by examining the totality of the circumstances."  United States v. Sagoes, 389 Fed. Appx. 911, 914 (11th Cir. 2010) (quoting Hubbard v. Haley, 317 F.3d 1245, 1252 (11th Cir. 2003)).

---

[21]An exception to this rule applies "for situations where police employ a deliberate 'question first' strategy" which Defendant does not argue is applicable and the court finds is not applicable to the facts before this court. Id. (quoting Missouri v. Seibert, 124 S. Ct. 2601, 2613 (2004)). And see United States v. Coleman, 2018 WL 4520218, at *7 (N.D. Ga. June 14, 2018) (discussing and applying Elstad and Seibert), report and recommendation adopted by 2018 WL 3769843 (N.D. Ga. August 9, 2018); United States v. Arroyo-Garcia, 2014 WL 1309078, at **9-11 (N.D. Ga. March 31, 2014) (same).

In determining whether a statement was made voluntarily, courts are to evaluate "the totality of all the surrounding circumstances--both the characteristics of the accused and the details of the interrogation." Schneckloth v. Bustamonte, 93 S. Ct. 2041, 2047 (1973); and see Lall, 607 F.3d at 1285 ("The burden is on the prosecution to establish, by a preponderance of the evidence, that a challenged confession was voluntary."). Those cases where courts have found confessions to be involuntary "all have contained a substantial element of coercive police conduct." Colorado v. Connelly, 107 S. Ct. 515, 520 & n.1 (1986) (citing Mincey v. Arizona, 98 S. Ct. 2408 (1978) (defendant subjected to four hour interrogation while incapacitated and sedated in intensive-care unit); Greenwald v. Wisconsin, 88 S. Ct. 1152 (1968) (defendant, on medication, interrogated for over eighteen hours without food or sleep); Beecher v. Alabama, 88 S. Ct. 189 (1967) (police officers held gun to the head of wounded confessant to extract confession)). "[F]actors taken into account have included the youth of the accused, . . . his lack of education, . . . or his low intelligence, . . . the lack of any advice to the accused of his constitutional rights, . . . the length of detention, . . . the repeated and prolonged nature of the questioning, . . . and the use of physical punishment such as the deprivation of food or sleep . . . ." Schneckloth, 93 S. Ct. at 2047 (citations omitted); and see United States v. Harrold, 679 F. Supp. 2d 1336, 1348

55

(N.D. Ga. 2009) ("In assessing whether a confession was voluntary, the court must determine whether the defendant made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him.") (citation and internal quotation marks omitted).  "'Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.'"  United States v. Thompson, 422 F.3d 1285, 1295-96 (11th Cir. 2005) (citation omitted).

The circumstances surrounding both the pre-Miranda statement and the interviews following Miranda warnings establish that Defendant's statements were voluntary.  First, with respect to his statement about being on parole/probation, Defendant was being lawfully detained, for approximately twenty minutes, while the search warrant was being executed.  Although he was handcuffed, at the time he made the statement, the agents' weapons were holstered and he was seated in front of the residence in a law enforcement SUV.  (Tr. at 4-5, 6-7, 25, 29-30, 41).  Defendant was not threatened, and the discussion was in a conversational tone.  The agents had only been speaking with Defendant for a few moments.  (Tr. at 6-7, 10, 34).  Although the agents had not advised Defendant of his Miranda rights, they did inform Defendant

that he was in custody and that he did not have to answer any questions.  (Tr. at 8, 32; 1st Interview).  And any impact from the initial entry into the residence to conduct the search pursuant to the warrant, which did not exceed that required by the circumstances, had dissipated by the time the agents spoke with Defendant.  In analogous situations involving the voluntariness of consents to search, the Eleventh Circuit Court of Appeals has declined to find that waivers of Fourth Amendment rights were involuntary under circumstances at least as, if not more, intimidating than those before this court.  See, e.g., United States v. Kimoana, 383 F.3d 1215, 1225-26 (10th Cir. 2004) (although "officers entered the motel room with guns drawn, raising their voices at the occupants and ordering them to put their hands where the officers could see them[,]" the trial court found that "[a]fter performing a pat down, the officers put their weapons back in their holsters, the atmosphere was described as 'calm,' and then [the officer] 'immediately' asked [the defendant] for consent to search the room[;]" therefore, when the consent to search was obtained, the situation had calmed down and no show of force was being exhibited); United States v. Taylor, 31 F.3d 459, 463-64 (7th Cir. 1994) ("The record shows that the initial melee of agents, badges and weapons, necessary to protect the safety of the agents . . ., dissipated only seconds after it had begun and that all was routine once the premises had been secured.  Though

57

certainly unpleasant, there is nothing so inherently coercive about such tactics, commonly used where a danger to life or limb is perceived by law enforcement agents, to render subsequent cooperation involuntary."); United States v. Hidalgo, 7 F.3d 1566, 1570-71 (11th Cir. 1993) (facts that the defendant "was arrested by SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint" did not establish consent to search was involuntary, even though consent was given after invocation of Miranda rights).  The pre-Miranda statement was voluntary.

The same is true of the statements that Defendant made after receiving Miranda warnings.  Again, the agents' firearms remained holstered, they used a conversational tone and they did not threaten Defendant, who advised that he was thirty years old and had a tenth grade education.  (Tr. at 6-8, 29-30).  Defendant appeared to understand English, did not appear to be under the influence of drugs or alcohol, did not appear to have a mental impairment or to be suffering from physical pain or emotional distress.  (Tr. at 9).  Defendant never requested an attorney and did not invoke his rights during either the first eleven minute interview or second seven minute interview. (Tr. at 9, 13).  After waiving his Miranda rights (which will be further addressed *infra*), Defendant openly discussed with the agents his possession of the marijuana in the

58

residence and that he sold marijuana, but he repeatedly denied selling firearms or other drugs or being aware that other drugs, such as cocaine, were in the residence.  He acknowledged that he was not supposed to have in his possession firearms but did so "for protection."  (1st Interview).  The most compelling evidence that Defendant's statements were voluntary is presented during the second interview with the agents when Defendant was advised about the drugs, including cocaine and pills, and firearms found in the residence and the agents sought his cooperation against third parties.  (Tr. at 12, 14-15, 34-35; 2nd Interview).  Defendant not only declined to provide information about third parties, even when advised that he could potentially reduce any sentence he was facing, but, when asked, he declined to give consent to search the electronic devices seized, including the cellular telephone found on his person.[22]  (2nd

---

[22]The agents' discussion with Defendant about the potential sentence that he faced and that now was the time to cooperate against other individuals to help himself was not improper.  See, e.g., United States v. Hipp, 644 Fed. Appx. 943, 947-48 (11th Cir. 2016) (statements to the defendant that he should tell the truth and that cooperating with the government may be beneficial or in his best interest does not render a statement involuntary but may amount to "'no more than affording [the defendant] the chance to make an informed decision with respect to [his] cooperation with the government'") (citation omitted); United States v. Jones, 32 F.3d 1512, 1516-17 (11th Cir. 1994) (the court refused to find that the arresting agents' honest assessment of the potential charges facing the defendant and the sentence which could be imposed for the offenses or that discussing the potential involvement of the defendant's girlfriend in the offenses rendered the defendant's subsequent statements involuntary); United States v. Laughlin, 2012 WL 3065404, at **14, 20 (N.D. Ga. July

Interview).  If Defendant's free will had been overborne by the actions of the agents, it would be reasonable to conclude that he would have also cooperated by naming other individuals and/or consenting to a search of cellular telephone.  See Coleman, 2018 WL 4520218, at *7 ("There is no evidence that the agents employed any coercion, threats or improper inducements at any time during the interview[,]" and the defendant's statements were voluntary); Harrold, 679 F. Supp. 2d at 1348-49 (the defendant's post-Miranda statements are voluntary and admissible; besides the lack of evidence of any coercion, threats, or improper inducements by the agents, the defendant "never asked to end the interview or to speak to an attorney[;]" and, "[i]n addition, [t]he fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative") (quoting Elstad, 105 S. Ct. at 1298) (internal quotation marks omitted; alteration omitted).

---

6, 2012) (the court found that the defendant's statement was voluntary because the agent's "comments about Laughlin not going to jail if he cooperated did not coerce Laughlin into waiving his Miranda rights[,]" that is, "at most [the agent] told Laughlin that his cooperation would be a factor in whether he would be taken to jail that night and as such amounted to a discussion of realistic penalties for cooperative defendants"), report and recommendation adopted by 2012 WL 3065527 (N.D. Ga. July 27, 2012).

AO 72A
(Rev.8/82)

The court next determines whether Defendant validly waived his <u>Miranda</u> rights. <u>See</u> <u>Coleman</u>, 2018 WL 5420218, at *7 (the defendant's "post-<u>Miranda</u> statements may nonetheless be subject to suppression if [his] waiver of his <u>Miranda</u> rights was not knowing, intelligent, and voluntary"); <u>Harrold</u>, 679 F. Supp. 2d at 1349 (same). "<u>Miranda</u> 'warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation.'" <u>United States v. Adams</u>, 1 F.3d 1566, 1575 (11th Cir. 1993) (quoting <u>Endress v. Dugger</u>, 880 F.2d 1244, 1248 (11th Cir. 1989)). The first question that the court must answer is whether Defendant was advised of his <u>Miranda</u> rights. <u>See</u> <u>United States v. Barbour</u>, 70 F.3d 580, 585 (11th Cir. 1995) ("The threshold inquiry is whether [the defendant] was informed of his <u>Miranda</u> rights."). In reaching this answer, the Supreme Court stated that it "has never indicated that the 'rigidity' of <u>Miranda</u> extends to the precise formulation of the warnings given a criminal defendant" and that "no talismanic incantation [is] required to satisfy its strictures." <u>California v. Prysock</u>, 101 S. Ct. 2806, 2809 (1981). Defendant does not dispute that he was advised of his <u>Miranda</u> rights.

The record establishes that Defendant was informed of his <u>Miranda</u> rights. Agent McLeod advised Defendant of his rights by informing him that he had the right

61

to remain silent, that anything he said could be used against him in court, that he had the right to consult with a lawyer before any questioning and to have a lawyer present during questioning, and that, if he could not afford a lawyer, one will be appointed for him before any questioning.  (1ˢᵗ Interview).  The agent asked Defendant if he understood his rights, and Defendant responded, yes.  (Id.).  The agent asked Defendant if he would waive his rights and talk, stating again that at anytime Defendant could state that he did not want to answer a question or did not want to talk anymore.  (Id.).

Having found that Defendant was advised of his rights, the court must next determine whether Defendant voluntarily, knowingly and intelligently waived those rights.[23]  See Barbour, 70 F.3d at 585.

This is a two-part inquiry:

"First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the 'totality of the circumstances surrounding the interrogation' reveal

---

[23]"It is well established that '[t]he government must prove by a preponderance of the evidence that [the defendant] made a knowing, voluntary and intelligent waiver of his Miranda rights.'"  United States v. Chirinos, 112 F.3d 1089, 1102 (11ᵗʰ Cir. 1997) (citation omitted).

> both an uncoerced choice and the requisite level of comprehension may
> a court properly conclude that the <u>Miranda</u> rights have been waived."

<u>Id.</u> (quoting <u>Moran v. Burbine</u>, 106 S. Ct. 1135, 1141 (1986) (internal citations and

quotations omitted)); <u>see also</u> <u>United States v. Farley</u>, 607 F.3d 1294, 1326 (11th Cir.

2010) (same).  The totality of all the surrounding circumstances, which a court must

evaluate to make these determinations, includes "both the characteristics of the accused

and the details of the interrogation."  <u>Schneckloth</u>, 93 S. Ct. at 2047; <u>see also</u> <u>United</u>

<u>States v. Bernal-Benitez</u>, 594 F.3d 1303, 1319 (11th Cir. 2010) (same).  No single

factor is necessarily determinative of the issue whether a defendant voluntarily,

knowingly and intelligently waived his rights, but the court must engage in a fact-

specific inquiry based on all of the circumstances.  <u>See</u> <u>Moore v. Dugger</u>, 856 F.2d

129, 134 (11th Cir. 1988).  The record establishes that Defendant knowingly,

intelligently and voluntarily waived his rights.

After being advised of his rights and stating that he understood his rights,

Defendant responded, "I want to know why ya'll came in the house."  (Tr. at 36; 1st

Interview).  The agent stated, "Okay, you have to say yes or no and I'll explain to you

some stuff."  (1st Interview).  Defendant stated, yes, and the agent again told him that

at any point Defendant could stop answering.  (<u>Id.</u>).  Defendant was then advised that

the agents had a search warrant for the house because they believed drugs and guns were sold out of the house. (Id.). Defendant appeared to understand his rights and the questions he was asked; he did not have any questions about his rights; and he was thirty years old and advised the agents that he had a tenth grade education. (Tr. at 8). Defendant appeared to understand English, did not appear to be under the influence of drugs or alcohol, did not appear to have a mental impairment or to be suffering from physical pain or emotional distress. (Tr. at 9). Defendant never requested an attorney and did not invoke his rights during either the first eleven minute interview or second seven minute interview. (Tr. at 9, 13). Again, the agents' firearms were holstered, and they did not threaten the Defendant and used a conversational tone. (Tr. at 6-7, 10, 34). As the court previously determined, any impact from the initial entry into the residence to conduct the search pursuant to the warrant, which did not exceed that required by the circumstances, had dissipated by the time the agents spoke with Defendant. See, e.g., Kimoana, 383 F.3d at 1225-26; Taylor, 31 F.3d at 463-64; Hidalgo, 7 F.3d at 1570-71.

Defendant answered questions about his activities at the residence, denying selling firearms or any drugs other than marijuana but repeatedly stating that everything in the residence was his. (1st Interview). When asked, Defendant denied

64

taking any medications, being injured or mistreated or threatened and denied being high or having drank alcohol.  (<u>Id.</u>).  Finally, as noted previously, Defendant was aware that he could decline to answer questions as evidenced by his refusal to provide names of third parties and his refusal to consent to a search of his cellular telephone indicating that his cooperation was voluntary.  (2nd Interview).  The court concludes, after a review of the testimony at the evidentiary hearing and of the recordings of the interviews with Defendant, that he knowingly, voluntarily and intelligently waived his <u>Miranda</u> rights.

For these reasons, the court recommends that Defendant's motion to suppress his pre-<u>Miranda</u> statement concerning his parole/probation for terroristic threats be granted and that his motion to suppress his pre-<u>Miranda</u> statement that "my shoes, clothes and my weed" were in the house and his post-<u>Miranda</u> statements during both interviews be denied.

## III.   Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 17] to suppress his statements be **DENIED** as to all statements with the exception that the motion [Doc. 17] be **GRANTED** as to his pre-<u>Miranda</u> statement concerning his parole/probation for terroristic threats.  The court

further **RECOMMENDS** that Defendant's motion [Doc. 18] and amended motion [Doc. 21] to suppress evidence be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO ORDERED** this 7th day of June, 2019.

_____
JANET F. KING
UNITED STATES MAGISTRATE JUDGE

66